ORIGINAL

James H. Fosbinder #7070
IVEY FOSBINDER FOSBINDER LLLC
A LIMITED LIABILITY LAW COMPANY
1883 Mill Street
Wailuku, Hawaii  96793
Telephone:  (808)242-4956
Facsimile:  (808)249-0668
Email: jfosbinder@iff-law.com

Attorneys for Plaintiffs
RUPERT N. KAMA and DIANA L. KAMA

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

NOV 17 2010

at ___ o'clock and ___ min ___ M.
SUE BEITIA, CLERK

### UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| RUPERT N. KAMA and DIANA L. KAMA | CIVIL NO.: **CV10 00681 SOM KSC** |
| Plaintiffs, | COMPLAINT; DEMAND FOR JURY TRIAL; SUMMONS |
| vs. | |
| FEDERAL NATIONAL MORTGAGE ASSOCIATION; BANK OF AMERICA N.A. AS SUCCESSOR TO COUNTRYWIDE HOME LOANS, INC.; BAC HOME LOAN SERVICING, LP, AS SUCCESSOR TO COUNTRYWIDE HOME LOAN SERVICING, LP; MERSCORP, INC.; MORTGAGE ELECTRONIC REGISTRATION SYSTEM, INC; and JOHN DOES 1-50, inclusive | |
| Defendants. | |

### COMPLAINT

Plaintiffs RUPERT N. KAMA and DIANA L. KAMA (hereinafter

"Plaintiffs"), by and through their attorney, JAMES H.

FOSBINDER, of IVEY, FOSBINDER, FOSBINDER LLLC, a limited

1

liability law company, bring the following Complaint and allege
and aver as follows:

### JURISDICTION AND VENUE

1.    Jurisdiction arises under 15 U.S.C. § 2, 12 U.S.C. §
2607, 15 U.S.C. 1601 et.seq., 15 U.S.C. 1605, 1661, 1635, 1639
1640, Title 12, Regulation Z, Part 226 et seq., Title 24 C.F.R.,
Regulation X, Part 3500; 18 U.S.C. § 1961; 18 U.S.C. §§ 1341,
1343 and 18 U.S.C. § 1956, 18 U .S.C. § 1962. The court also has
authority to hear Federal Law. This Court has supplemental
jurisdiction over this action under 28 U.S.C. 1367(a) because
state law claims are so related to the federal claims that they
form part of the same case or controversy. These claims all
arise out of the same controversy and sequence of events. This
Court has jurisdiction over state claims asserted under Hawaii
Revised Statutes (hereinafter "HRS") §§ 480 and 481A by virtue
of pendent jurisdiction.

2.    Venue is proper in the United States District Court
for the District of Hawaii, pursuant to 28 U.S.C. § 1391 and 18
U.S.C. § 1965(a), in that Defendants systematically conduct and
transact substantial business in this State and District as
licensed banks and corporations organized and/or operating in
the State of Hawaii, the causes of action occurred in this
District, and Plaintiffs reside in this District.

### PARTIES

3.    Plaintiffs, Rupert N. Kama and Diana L. Kama are and were at all times relevant herein over the age of eighteen and were residents of the County of Hawaii, State of Hawaii, and are consumers in regard to credit transactions.

4.    Defendant FEDERAL NATIONAL MORTGAGE ASSOCIATION (hereinafter "FNMA") is a congressionally chartered corporation and claims title to the subject property by way of Mortgagee's Quitclaim Deed Pursuant to Power of Sale, dated August 26, 2010, which was recorded in the State of Hawaii Bureau of Conveyances, Document No. 2010-124865.

5.    Defendant BANK OF AMERICA was at all times relevant hereto a National Banking Association organized under the laws of the State of North Carolina, and conducting business within the State of Hawaii (Defendant "BofA"). Defendant BofA is Successor to COUNTRYWIDE HOME LOANS, INC. a New York corporation, (hereinafter "COUNTRYWIDE"), which also transacted business in the State of Hawaii and was the originating lender under Mortgage dated March 16, 2007, in the amount of $400,000.00, which was recorded in the State of Hawaii Bureau of Conveyances, Document No. 2007-051659 and was also the originating lender pursuant to a Home Equity Line of Credit in the amount of $104,000, also dated March 16, 2007, and recorded State of Hawaii Bureau of Conveyances, as Document No. 2007-051660.

6.    Defendant BAC HOME LOAN SERVICING, LP, was at all times relevant hereto and is a division of BANK OF AMERICA, which is a National Banking Association organized under the laws of the State of Texas, and which conducts business within the State of Hawaii ("BAC"). Defendant BAC is the successor to COUNTRYWIDE HOME LOAN SERVICING, LP.

7.    Defendant MERSCORP, Inc. is a Delaware corporation whose corporate headquarters is in Virginia. Shareholders and MERS membership include a majority of corporations engaged in the mortgage industry in the United States.[1]

8.    Defendant Mortgage Electronic Registration Systems, Inc. (MERS), a New York corporation, is a wholly owned subsidiary of Defendant MERSCORP, Inc. MERS provides mortgage loan related services in all fifty states, and is "nominee" for Defendant BAC, successor to COUNTRYWIDE, pursuant to three (3) documents, all recorded March 21, 2007, in the State of Hawaii

---

[1] MERSCORP, INC.'s shareholders include ABN-AMRO Mortgage Group, Inc.; American Land Title Association; CCO Mortgage Corporation; Chase Home Mortgage Corporate of the Southeast; CitiMortgage, Inc.; Commercial Mortgage Securities Association; Corinthian Mortgage Corporation; Countrywide Home Loans, Inc.; EverHome Mortgage Company; Fannie Mae; First American Title Insurance Corporation; Freddie Mac; GE Mortgage Services, LLC; GMAC Residential Funding Corporation; Guaranty Bank; HSBC Finance Corporation; Merrill Lynch Credit Corporation; MGIC Investor Services Corporation; Mortgage Bankers Association; Nationwide Advantage Mortgage Company; PMI Mortgage Insurance Company; Stewart Title Guaranty Company; SunTrust Mortgage, Inc.; United Guaranty Corporation; Washington Mutual Bank; Wells Fargo Bank, N.A., and WMC Mortgage Corporation.

Bureau of Conveyances, Documents Nos. 2007-051658, 2007-051659, and 2007-051660.

9.   Defendant BAC alleges it was the foreclosing mortgagee pursuant to Assignment of Mortgage dated August 10, 2009, by Mortgage Electronic Registration Systems, Inc., a New York Corporation, as nominee for Countrywide Home Loans, Inc., which was recorded in the State of Hawaii Bureau of Conveyances, as Document No. 2009-144475. Said Assignment is silent as to the underlying Promissory Note.

10.   According to Defendant BAC's "Mortgagee's Affidavit of Foreclosure Under Power of Sale," on or about July 1, 2010, Defendant BAC, alleges it was the highest bidder ($492,657.93) at the foreclosure sale of Subject Property. Said Affidavit was recorded in the State of Hawaii Bureau of Conveyances as Document No. 2010-097975.

11.   The acts and/or omissions of Defendants alleged in this Complaint were performed by their agents, officers, affiliates and/or employees within the scope of their actual or apparent authority which were known and/or should have been known to Defendants and/or their predecessors in interest and/or are imputed to Defendants.

12.   DOES Defendants 1-50, inclusive, are various individuals, partnerships, associations, corporations, and other

entities claiming any legal right, title, estate, lien, or interest in the Subject Property, as described adverse to Plaintiffs' interests. Plaintiffs will make a good faith effort to determine the true names and identities of these parties. Plaintiffs reserve the right to amend this Complaint to add such parties as their true identities and capacities are ascertained through discovery or otherwise.

13.   Defendants operate mortgage originating and mortgage servicing businesses that solicit, cater, and service millions of home loans annually.  Based on understanding and belief, certain Defendants and their agents, officers, affiliates and/or employees have operated as a common enterprise while engaging in the unlawful acts and practices alleged below. Because Defendants have operated as a common enterprise, each of them is jointly and severally liable for the acts and practices alleged below.  Additionally, because any acts and/or omissions were performed by Defendants' agents, officers, and/or employees within their scope of their actual or apparent authority, which were known and/or should have been known to Defendants and/or their predecessors in interest, are imputed to Defendants.

## INTRODUCTION[2]

14.  Historically, loans were mainly made by lenders within the local marketplace. Banks made money by charging more interest than they paid to depositors. If the bank made bad loans, the bank lost income. For this reason, banks made serious investigation of the borrower's ability to pay back the loan. When a bank approved a loan application, it meant something; it meant it was likely the borrower *could* and would repay the loan. Loans often remained with the original lender for the lifetime of the loan.

15.  Although speculation in real estate existed, profits were generally made from appreciation of land values over time largely because of the checks and balances of the loan origination process itself and also due to the demands of the statutory recordation requirements. The only way to aggressively buy and sell an interest in mortgage-related assets on a frequent basis was to buy stock in corporations set up to invest/speculate in real estate. Most important, it was almost

---

[2] This is an extraordinary case. At times, as explained in this Complaint, terms to do not have their traditional meanings as they have been converted by MERS. For this reason, it is believed that an unconventional pleading style can and will best convey the Plaintiffs' message, and tolerance for such unconventionality is respectfully requested as being in the best interests of justice and truth. In light of the liberties taken by the Defendants in terms of judicial and statutory administration and procedure, the tolerance of this Court for

impossible to invest in a speculative way in single-family
homes. You could invest in the stocks of companies that built
single family homes, or in the stock of lenders that financed
home loans, but that was about it. Day trading in securities
based on real property did not exist, and the securitization of
residential mortgages was non-existent.

16.   Land records such as deeds, mortgages, and assignments
of mortgage were recorded in the Hawaii Bureau of Conveyances
and/or with the Assistant Registrar of the Land Court. If a
mortgage was assigned to a new mortgagee, that assignment was
recorded and therefore was publicly available.

17.   Recordation of paper, however, was not fast or cheap
enough for the mortgage industry. Seeking a means of
capitalizing on the huge profits to be made from mortgage
securitization, the largest banks in the United States got
together to form Merscorp, Inc., in or about 1996. Mortgage
Electronic Registration System, Inc., whose sole shareholder is
Merscorp (Collectively, the entities are referred to herein as
"MERS"), was then allegedly created to streamline the mortgage
banking industry by using "electronic commerce" to eliminate
paper – which allowed the mortgage industry to circumvent the

---

the slightly unconventional stylings of the undersigned counsel
in this pleading would seem warranted.

state's recordation statutes and bundle mortgages into packages they could then sell to investors.

18.  MERS' mission was to register every mortgage loan in the United States[3] to facilitate trading in mortgage-backed securities. The MERS monopoly now includes more than 90 percent (by gross lending) of the mortgage lenders and servicers active in the United States. Since its creation, MERS has undermined and eviscerated the long-standing principles of real property law and the state's recording statutes and the borrowers and the public at large are paying an enormous price for the profits reaped by this scheme, not to mention robbing the states of their transfer and excise tax revenues.

19.  The way that MERS circumvents the state's recording statutes is as follows: In mortgages, MERS is named as "nominee" for the lender (arguably a form of agency). It is often the entity recorded in the state recordation office as being the original mortgagee. MERS claims that this "inoculates" the mortgage against future assignments because MERS remains the nominal mortgagee "no matter how many times servicing is traded."[4] Tracking subsequent assignments of mortgage happens strictly within the MERS databases.

_____

[3] "About MERS," Merscorp, Inc. www.mersinc.org/about/index.aspx. Retrieved 11/8/2010.
[4] Id.

"Because MERS remains the mortgagee of record in the public
land records throughout the life of the loan; it eliminates
the need to record later assignments in the public land
records… . MERS does not create electronic assignments; it
eliminates the need for subsequent assignments altogether.
After MERS becomes Mortgagee, there are no more
assignments, except on the rare occasion when a Member
wants an assignment from MERS."[5]

20.   A typical clause naming MERS in a mortgage is as

follows: "MERS" is Mortgage Electronic Registration Systems,

Inc. MERS is a separate corporation that is acting solely as

nominee for Lender and Lender's successors and assigns. MERS is

the mortgagee under this Security Instrument.

21.   Recent legal challenges have questioned the legal

inconsistencies in MERS' roles: as "nominee" (arguably "agent")

and also as "mortgagee," i.e., the owner of the real property

right to foreclose. An entity can not be both an agent and a

principal with respect to the same right. Further, upon

information and belief, the State of Hawaii has never authorized

MERS to make changes to the state's real property recording

statutes. Plaintiffs argue that MERS, purporting to act "solely

as nominee," furthers foreclosures by (among other acts)

transferring promissory notes and appointing assignees under

assignments of mortgage in a system that is hidden from public

and governmental scrutiny and oversight. For example, it is

_____

[5] R.K. Arnold, "Yes, There is Life on MERS®" Real Estate Law, ABA
Network, Spring 1998, Vol. 2, No. 1.

nearly impossible for any but the most savvy researcher to discover the trail of assignments leading to a borrower's current note holder and mortgagee. In many cases, the actual mortgage and promissory note have been destroyed or are now missing, which raises questions of who owns the mortgage and note and how (and who) enforces these agreements. Missing documents leaves the parties to the contract unidentifiable, which also affects contract reformation – "loan modification."

22. Hand-in-hand with the largest lending institution's joint creation of MERS, the mortgage industry introduced new "products" such as "non-documentation loans" (aka "no doc loans" and adjustable-rate mortgages, known as "ARMS," and the most egregious of all, negative amortization loans (In other words, after 10 years of making your mortgage payments, you owe more than you borrowed originally). Mortgage lenders acting in concert relaxed lending standards, making lower-income individuals eligible for loans. This, in turn, drove up property "values." Part of this scheme included accepting "appraisals" that purported to document the new, higher values. The result was that hundreds of thousands of applications for financing were approved nationwide, most of which would have been declined under traditional lending standards.

---

http://www.abanet.org/genpractice/magazine/1998/spring-bos/arnold.html.

23.    Behind the veil of Merscorp and MERS, the big lending institutions knew they were issuing "bad paper" – in many cases, lenders told borrowers at the eleventh hour that the loan terms they had been promised were no longer available, and lenders swapped out grossly negligent loan documents at the eve of closing. The mortgage giants intended to get in and get out of the mortgage-backed securities marketplace before the borrowers defaulted on a loan they could never afford – and should never have been coerced into in the first place. The result is that the borrowers and the investors in mortgage-backed securities were both victims of this mass fraud perpetuated by MERS and its members.

24.    MERS, again, was created primarily to facilitate the securitization of mortgages, which, in simple terms, involves three steps: First, a mortgage is sold by its originating lender; second, the mortgages are "bundled" or "pooled"; third, the pool of mortgages is securitized and divided into "tranches" (broken up into groups indicative of the risk to investors, also called "derivatives").

25.    The third step – securitization – of a pool of mortgages is complicated, and the process is (or should be) governed by the laws of the jurisdiction in which the securitization takes place. The early mortgage securitization contracts were designed to satisfy state and federal laws, such

as the Uniform Commercial Code (governing "secured"
transactions), and state trust law (packaged loans were often
put into trusts that allegedly offered protections that appealed
to investors).

26.   Securitizing a mortgage loan is labor-intensive: The
promissory note had to be endorsed by the originator and other
parties before it could be placed into the trust, and the
mortgage had to be assigned to the Note Holder. Generally, this
process must be completed within 90 days of a trust's "closing."
Most mortgage-backed securities are bonds issued by U.S.
government-sponsored Federal National Mortgage Association
(Fannie Mae) and the Federal Home Loan Mortgage Corporation
(Freddie Mac), but mortgage-backed securities can also be issued
by private companies.

27.   Additionally, with the securitization of mortgages,
investors could successfully wager on the failure of mortgages.
When interest rates rose, these mortgage-backed securities
(often in the form of bonds) fell in value; conversely, when
interest rates fell, the value of the bond rose.

28.   MERS, its members, and others with inside information
could win big. If an investor was privy to information that a
good number of mortgages in a pool would fail or that the
mortgages exceeded the value of the collateral, they could bet
these mortgage-backed securities would be worth less in the

future. Add to this the leverage available through the options,
or futures markets, and an institution could gamble on millions
of dollars of mortgages with very little investment. These
highly leveraged "derivatives" enabled investors to capitalize
on mortgages being worth more, or worth less, in the short term.

29.   Hence, a banking institution could "insure" itself
against losses in the underlying mortgages by betting that a
number of the mortgages it underwrote, would fail. Talk about
inside information.

30.   Making the deal sweeter for the banks/originators of
the loans, the mortgages had already been sold via MERS, most
likely into an investment pool where the actual investors also
were sold bonds grossly inflated in value and quality by the
mortgage industry. The scheme to dupe the investors was also
deceptively simple: Through placing vastly undercapitalized so-
called "insurance" on the lowest-rated loans (Triple C), the
players magically turned those junk loans into Triple A-rated
bonds, turning millions into billions worth of profit when they
were sold.

31.   In addition, most institutions holding subprime
mortgages required mortgage insurance on the loans, sometimes
insuring against mortgage failure 30-times over. They stood to
gain more if a borrower defaulted than if he performed fully;
hence, there was not much of an incentive to modify or refinance

loans for borrowers who had fallen on tough times – despite federal government programs paying lending institutions to do that very thing.

32.   For those loans that were insured against default – what happened to the insurance money? Has the foreclosing lender been paid once by the insurance company (financed by a federal bailout of insurance giant AIG and others) and seeks to be paid twice by foreclosing on the real property and selling it? If the foreclosing lender has already been paid off, then is the proper party in interest the insurer?

33.   The MERS cartel also controls mortgage servicing and another product, called "foreclosure assistance."  Their monopoly here is roughly 90 percent. One such firm has made national news by offering a menu of services, which has been reported by the national media to include "creating – that is, conjuring from thin air – various documents that the trust owning the loan should already have on hand." The firm offers creation of a "collateral file," i.e., all the documents needed to establish ownership of a real estate loan. "Equipped with a collateral file, you could likely persuade a court that you were entitled to foreclose on a house even if you had never owned the loan."[6]

---

[6] Smith, Yves, "How the Banks Put the Economy Underwater," New York Times, October 30, 2010.

34.   Attorneys general from all 50 states are investigating the poor record keeping by MERS, banks, and the servicers (companies that collect mortgage payments). The Federal Reserve is investigating whether mortgage companies have cut corners in the foreclosure process, using "robo-signers" to sign thousands of mortgage assignments and foreclosure documents without having made the legal investigation required to execute such documents.

35.   Many anti-trust claims involve esoteric mathematical analysis of claimed price manipulation by companies controlling as little as 10 percent of an industry in relatively small area. Complex math is not necessary in this case. Under any test, MERS and its shareholders control the mortgage industry, the foreclosure assistance industry, and the digital identification of real property.

36.   What MERS and the mortgage industry did was to turn poker in the back of the neighborhood bar, where there were no sharks and everyone knew each other and the pace was leisurely, into Monte Carlo, Las Vegas and internet gambling all rolled into one. As a result the real property markets were destabilized; banks made fabulous income on fees and a million families will lose their homes to foreclosure. MERS and its shareholders were well aware that they had created a Ponzi

http://www.nytimes.com/2010/10/31/opinion/31smith.html?_r=1&sq=m ortgage securitization&st=cse&scp=1&pagewanted=all. Accessed

scheme – but like all "successful" such schemes, if you get in and out early, they make darn fine investments.

37.   What justice demands today is that the borrowers -- and the investors -- in the mortgages have an opportunity to work through this mess of the securitization of mortgages and come to a resolution that is best for both parties, and, the public at large. Plaintiffs request the opportunity to work with the actual investors of the mortgages, which would be a question of fact that can only be resolved by an evidentiary hearing into who is the actual Note Holder, how much is owed and to whom, and whether any third-party payments have been made on Plaintiffs' behalf, by insurance or otherwise.

### FACTUAL ALLEGATIONS REGARDING DEFENDANTS BANK OF AMERICA AND COUNTRYWIDE, ET AL.

38.   Effective April 27, 2009, Countrywide Home Loans Servicing, LP, changed its name to BAC Home Loans Servicing, LP (Defendant "BAC"), which is the servicing branch of Defendant Bank of America Corporation ("BofA"). As each of these entities were the predecessors/successors, subsidiaries, and/or agents of one another at all times relevant herein, collectively, these Defendants will be referred to as "BAC."

39.   Defendant BAC, through its predecessor in interest Countrywide, was among the leading providers of mortgages

11/8/2010.

nationally at all times relevant to this Complaint. By 2005,
Countrywide was the largest U.S. mortgage lender, originating
more than $490 billion in mortgage loans in 2005, more than $450
billion in 2006, and more than $408 billion in 2007.

40. In 2007, Defendant Bank of America ("BofA") commenced
negotiations with Countrywide, and by late 2007, BofA began
merging its operations with Countrywide and adopting some of
Countrywide's practices. From and after its acquisition of
Countrywide in 2008, and continuing to the present, both as a
successor in interest to Countrywide and its principal, BofA has
engaged in and continued the wrongful conduct complaint of
herein.

41. The fraud perpetuated by the Countrywide Defendants
beginning on or before 2007 and until the present, including
BofA starting no later than 2007, was willful and pervasive. It
began with simple greed and then accelerated when Countrywide
founder and CEO Angelo Mozilo ("Mozilo") discovered that
Countrywide could not sustain its business unless sit used its
size and large market share in Hawaii to systematically create
false and inflated property appraisals throughout the state.
Countrywide then used these false property valuations to induce
Plaintiffs and other borrowers into ever-larger loans on
increasingly risky terms. As Mozilo knew from no later than
2004, these loans were defective and unsustainable for

Countrywide and the borrowers and to a certainty would result in
a crash that would destroy the equity invested by Plaintiffs and
other Countrywide borrowers.

42.   Along with its fraudulently obtained mortgages, Mozilo
and others at Countrywide began to "pool" mortgages and sell the
pools for inflated values. Rapidly, these two schemes grew into
a plan to disregard underwriting standards and fraudulently
inflate property values – state by state, county by county,
borrower by borrower – in order to take business from legitimate
mortgage lenders and moved on to massive securities fraud, which
involved concealment from, and deception of, borrowers such as
the Plaintiffs.

43.   From as early as 2004, Mozilo and Countrywide's senior
management knew the scheme would cause a liquidity crisis that
would devastate Plaintiffs' home value and net worth. But,
Countrywide's management did not care because their plan was
based on insider trading – pump the values as long as they
could, write as many bad loans as they could, and then dump them
into the market before the truth came out and Plaintiffs' losses
were apparent.

44.   At the time of entering into the notes and mortgages
referenced herein, Countrywide as originator of the mortgage and
each Defendant in the chain of title of the foregoing mortgages
and the successors to each of the foregoing mortgages was bound

and obligated to fully and accurately disclose to each borrower that the mortgages being offered to the Plaintiffs were, in fact, part of a massive fraud that Defendants knew or should have known would result in the loss of the equity invested by Plaintiffs in their home and in severe impairment of Plaintiffs' credit rating.

45. From 2008 to the present, the Plaintiffs and other Hawaii borrowers' home values decreased as a direct and proximate result of the Defendants' scheme as set forth herein. Defendants' business premise was to leave the borrowers, including Plaintiffs, holding the bag once Countrywide and its executives had cashed in, reaping huge salaries and bonuses and selling Countrywide's shares based on their inside information, while investors were still buying the increasingly overpriced mortgage pools and before the inevitable denouement. This massive fraudulent scheme was a disaster both foreseen by Countrywide and waiting to happen. Defendants knew it, and yet they still induced Plaintiffs into their scheme without any notice to them of the risks.

46. Defendants' improper acts have continued and include issuing Notices of Default in violation of Hawaii Revised Statutes and knowingly and falsely misrepresenting their ability and intention to arrange loan modifications for Plaintiffs while creating abusive roadblocks to deprive Plaintiffs of their legal

rights, including running the clock in an attempt to toll Plaintiffs' ability to rescind the loan contract.

### STATEMENT OF FACTS RELEVANT TO ALL CLAIMS

47.   The allegations contained in the preceding paragraphs of this Complaint are incorporated herein by reference.

48.   Plaintiffs entered into a loan transaction to finance the Subject Property. They executed a Promissory Note ("Note") in the principal amount of $400,000 on or about March 16, 2007. Plaintiffs also executed a second Promissory Note and Mortgage for a home equity line of credit ("HELOC") in the amount of $104,000.00, as further identified above. Both loans were originated through COUNTRYWIDE, predecessor in interest to Defendant BAC HOME LOAN SERVICING, LP ("BAC").  At the time of the closing both Notes were secured by Mortgages affecting the Subject Property.

49.   The combination of such transactions including a first mortgage and a 2nd HELOC mortgage were commonly called "80/20" loans.  These loans financed 100 percent of the property value. Mortgage insurance was almost always required of such loan arrangements.

50.   Plaintiffs placed their trust and confidence in Defendant BAC and/or its predecessor to properly qualify them for the loans and to provide them with the most favorable loan

program and loan terms and felt Defendants would look out for their best interest in meeting their mortgage needs.

51.   Plaintiffs followed all instructions of Defendant BAC and/or its predecessor and submitted all documentation requested by said Defendant. Plaintiffs' felt that Defendant BAC and/or its predecessor had a fiduciary obligation to them to protect their interests and maintain their privacy.

52.   Defendants and/or their predecessors in interest required an appraisal of Plaintiff's property as part of the loan application process which Plaintiffs paid for in the closing costs.  Plaintiffs relied upon the accuracy of the Defendants' appraisal in making their decision to pledge their collateral (property).

53.   Based upon Defendants' and/or their predecessors in interest's failures to provide any other necessary documents and make required disclosures so that Plaintiffs could make a fully informed decision, Plaintiffs were lured into accepting and executing Mortgages and Promissory Notes directly resulting in financial benefit to Defendants, substantially increasing the likelihood that Plaintiffs would default on the Mortgage and Note.

54.   Based upon information and belief, Plaintiffs submitted to Defendant BAC and/or its predecessor a loan

application, and Plaintiffs were not provided with a signed and
dated copy of the application as required under law.

55.   Plaintiffs were not provided with time to review the
loan documents prior to the loan's "closing" and/or signing of
the mortgage documents. Plaintiffs were not afforded the
opportunity to have their legal counsel review the detailed
documents. No explanation was given regarding the adjustable
interest rate and the affect on the Plaintiffs' monthly payment
and/or their ability to pay for the first and second mortgages
based upon their income. Defendant BAC and/or its predecessor
assured Plaintiffs that they could refinance their adjustable-
rate loan once the initial low-interest rate expired.

56.   Defendant BAC and/or its predecessor in interest
failed to provide Plaintiffs with an initial truth in lending
statement and a Good Faith Estimate within three days of the
application as required by law.

57.   Defendant and/or its predecessor in interest failed to
provide timely notice of various other legally required
disclosures concerning said loan application and loan,
including, but not limited to, the final truth in lending
disclosures, the HUD settlement statement, and notification of
other consumer rights of Plaintiffs.

58.   Plaintiffs were not informed by Defendant BAC and/or
its predecessor that it was treating the loan application as a

subprime loan, that it intended to qualify Plaintiffs based upon stated income and stated assets and/or no income and no assets, that this would not be and was not conforming to usual and customary underwriting guidelines, and that by doing so, it would increase Plaintiffs' opportunity to qualify for a loan and would increase Plaintiffs' likelihood of defaulting in the continued payment of any obligation under said Note resulting in foreclosure and loss of Plaintiffs' home.

59.  Due to the lack of above-referenced disclosures, among others, Plaintiffs did not understand the true terms of the loan being proposed, were unable to compare the loan with loan terms from other lenders, and Defendant did not explain and/or concealed the true loan terms from Plaintiffs.

60.  Defendants and/or their predecessors in interest targeted inappropriate or excessively expensive credit to persons who were not financially sophisticated and were otherwise vulnerable to abusive practices.

61.  Defendant BAC and/or its predecessor apparently used a no-income, no-asset income product for approval based on the alleged value of the collateral without considering the Plaintiffs ability to sustain the future payments of the loan.

62.  Under the Truth in Lending Act (TILA), 15 U.S.C. §§ 1661-1666j, Defendant BAC and/or its predecessors in interest failed to provide Plaintiffs with a notice of the right to

cancel, an accurate payment schedule, disclose the interest rate, provide a signed and dated loan application, provide a Good Faith Estimate (GFE), a consumer handbook on adjustable-rate mortgages, disclose that Plaintiffs could obtain insurance with a vendor of their choice and not have to pay higher priced premiums to a provider of lender's choice, and otherwise accurately disclose the purported legal obligation of the parties.

63.   Under the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. sections 2601-2617, Defendant BAC and/or its predecessors in interest failed to disclose all affiliated business arrangements, that they were giving the broker hidden fees for the referral of settlement business, the HUD-1 settlement statement at closing, and that they could not charge fees in excess of the reasonable value of goods and services provided.

64.   Defendant BAC and/or its predecessor failed to properly qualify Plaintiffs as being able to afford the loan payments amortized over the life of the loan.

65.   Defendant BAC and/or its predecessor failed to inform Plaintiffs and explain in any meaningful way that Plaintiffs could compare terms and/or might qualify for a better loan program offered by Defendant and/or their predecessors in interest.

66. Defendant BAC and/or its predecessor failed to disclose and/or deliberately concealed Plaintiffs consumer rights, including but not limited to, the right of rescission and/or cancellation of the loan transaction prior to closing and recordation of the Mortgage.

67. Defendant BAC and/or its predecessor failed to inform Plaintiffs that by failing to follow generally accepted underwriting guidelines in qualifying Plaintiffs for the loan that it was likely that Plaintiffs would default and lose their interest in the Property.

68. Based upon information and belief, Defendants, and all of them, failed to inform and explain to Plaintiffs that it intended to securitize and sell the Note and/or Mortgage and/or portions thereof to other lenders and loan servicers.

69. Based upon information and belief, Defendants failed to inform and explain to Plaintiffs that it would disclose confidential personal and financial information to other banks or lending institutions or investors who sought to purchase bundled loans that had been securitized and sold as investments and otherwise failed to provide Plaintiffs with a required opt-out notice.

70. Based on information and belief, Defendants bought or sold highly leveraged instruments in the futures, or options market, which were in direct opposite of Plaintiffs' interests.

71.  Based on information and belief Defendants actually gambled on the failure of Plaintiffs, the loss of their home, and the depression of the housing market.

72.  Based on information and belief, Defendants did profit from the highly leveraged instruments which were/are in opposite of Plaintiffs' interests and the housing market in whole.

73.  The acts and/or omissions of Defendant BAC and/or its predecessor in interest were known and/or should have been known to all Defendants and/or their successors, or predecessors in interest, and/or are imputed to all Defendants.

74.  Plaintiffs made payments on said loan from their monthly income and from savings and from cash advances on credit cards, and experienced significant financial hardship due to having to pay for a loan that they were not properly qualified for under usual and generally accepted underwriting guidelines.

75.  Defendants and/or their predecessors in interest intentionally and/or recklessly failed to disclose and/or concealed various information and documents from Plaintiffs and knowingly placed Plaintiffs in a loan they could not afford.

76.  Plaintiffs experienced loan distress and asked Defendants for assistance in modifying and/or refinancing said loan.

77.  Eventually, after much toil and numerous demands by Defendants, Plaintiffs were offered a "trial" modification and

complied with every demand and requirement of Defendants and/or
their predecessors in interest.

78.   Defendants deliberately promised permanent
modification in order to prevent Plaintiffs from exercising
their statutory right to rescind the loan transactions. Once the
statute of limitations for loan rescission had run, Defendants
abandoned the "trial modification" of Plaintiffs' loan and
proceeded to illegally foreclose upon said property on or about
July 1, 2010.

79.   Based on information and belief, during the life of
the foreclosed loan, Defendants and/or their predecessors in
interest sold and/or transferred the Note and Mortgage without
proper endorsement or assignments, resulting in Defendants
and/or their predecessors in interest not having the right and
interest to foreclose upon the subject property.

80.   Based on information and belief, Defendants and/or
their predecessors in interest failed to provide Plaintiffs with
legally sufficient and timely notice of the intent to foreclose
thereby voiding the foreclosure and attempted sale of said
property at auction.

81.   Violations of federal and state statutes, alleged
herein, bar Defendants from filing, causing to be filed, and/or
conducting ejectment proceedings against Plaintiffs.
Alternatively, Plaintiffs' defenses, claims and rights,

including but not limited to the right to recovery of damages,
injunction and any other remedy available under State, Federal,
and/or common law, under the Mortgage and Note bar Defendants
from taking any action, including filing, causing to be filed,
and/or conducting ejectment proceedings against Plaintiffs.

CLAIM I
VIOLATIONS OF THE SHERMAN ANTI-TRUST ACT

82.   The allegations contained in the preceding paragraphs
of this Complaint are incorporated herein by reference.

83.   The conduct of Defendants as described more fully
hereinabove violates the Sherman Anti-Trust Act, 15 U.S.C. § 2.

84.   Defendants have engaged in predatory conduct or
anticompetitive conduct in an attempt to monopolize the mortgage
lending and servicing market. Defendants intended at all times
relevant herein to control mortgage lending prices and practices
and/or to destroy competition with respect to this segment of
commerce.

85.   Defendants inflated the real estate market in an
effort to create and sell subprime mortgages. They sold over-
leveraged, highly inflated loans to the Plaintiffs, who were
unsophisticated borrowers who did not know they were being set
up to fail. Defendants then "pooled" groups of mortgages and
securitized said mortgages. Defendants created and/or
participated in a securities ratings scheme designed to

fraudulently rate these securities as safer than they truly were. Then, based upon their fraudulent misrepresentations of the securities, Defendants sold the securities to investors who were also duped into believing that these mortgages were sound financial products.

86.   Defendants and/or entities under their enterprise, took positions in the futures, or options, markets whereby Defendants sought to profit, and did profit, from the collapse of the real estate market, and, benefited from the foreclosure of numerous mortgages that Defendants originated, serviced, or controlled.

87.   The Defendants' acts worked to create the collapse of the mortgage market, which in turn created an economic collapse unprecedented since the Great Depression. Plaintiffs, like millions of Americans, experienced job layoffs and a severe decline in their income, which resulted in Plaintiffs being unable to pay their mortgage payments and suffering a decline in their credit rating causing them to be unable to secure refinancing, which is just as Defendants planned.

88.   As a direct and proximate result of the unlawful conduct of Defendants, and each of them, in monopolizing and/or attempting to monopolize the mortgage lending and servicing market, Plaintiffs have suffered pecuniary damages in an amount

to be determined, along with other pecuniary and non-pecuniary damages.

## CLAIM II
## VIOLATIONS OF THE HAWAII ANTI-TRUST/ANTI-MONOPOLY ACTS

89.   The allegations contained in the preceding paragraphs of this Complaint are incorporated herein by reference.

90.   Mortgage lending and servicing in Hawaii is an activity in or affecting interstate commerce under Section 2 of the Sherman Act, as the parties traffic in personal service to foreigners and rely on foreign goods for their businesses.

91.   The conduct of Defendants as described more fully hereinabove violates the Hawaii Anti-Trust Act, Hawaii Revised Statutes § 480-13, and the Hawaii Monopolization Act, Hawaii Revised Statutes § 480-9.

92.   As a direct and proximate result of the unlawful conduct of Defendants, and each of them, in monopolizing and/or attempting to monopolize the mortgage lending and servicing market, have suffered pecuniary damages in an amount to be determined, along with other pecuniary and non-pecuniary damages.

## CLAIM III
## CIVIL CONSPIRACY

93.   The allegations contained in the preceding paragraphs of this Complaint are incorporated herein by reference.

94.   In connection with the application for and consummation of the mortgage loan which is the subject of this action, Defendants and/or their predecessors in interest agreed, between and among themselves, to engage in actions and a course of conduct designed to further an illegal act or accomplish a legal act by unlawful means, and to commit one or more overt acts in furtherance of the conspiracy to defraud the Plaintiffs.

95.   Defendants and/or their predecessors in interest agreed between and among themselves to engage in the conspiracy to defraud for the common purpose of accruing economic gains for themselves at the expense of and detriment to the Plaintiffs.

96.   The actions of the Defendants were committed intentionally, willfully, wantonly, and with reckless disregard for the rights of the Plaintiffs.

97.   As a direct and proximate result of the actions of the Defendants in combination resulting in fraud and breaches of fiduciary duties, Plaintiffs have suffered damages. Plaintiffs thus demand an award of actual, compensatory, and punitive damages.

CLAIM IV
FRAUDULENT MISREPRESENTATION

98.   The allegations contained in the preceding paragraphs of this Complaint are incorporated herein by reference.

99.   Defendants and/or their predecessors in interest knowingly and intentionally concealed material information from Plaintiffs which were required by federal statutes and regulations to be disclosed to the Plaintiffs both before and at the time of closing.

100. Defendants and/or their predecessors in interest also materially misrepresented and/or failed to disclose material information to the Plaintiffs with full knowledge by defendants that their affirmative representations were false, fraudulent, and misrepresented the truth at the time said representations were made and/or were omissions of material fact.

101. The omissions of material fact and/or the material misrepresentation of material facts include but are not limited to, the following:

(a)   Concealing the failure to follow usual and customary underwriting guidelines to qualify Plaintiffs for a loan;

(b)   Misrepresenting and/or concealing the true terms of the loan;

(c)   Misrepresenting the ability to refinance the loan at a later date;

(d)   Misrepresenting and/or concealing the true amount of interest Plaintiffs would have to pay over the life of the loan;

(e)   Concealing that property values were declining and
      would likely continue to do so in the foreseeable
      future;

(f)   Concealing that Plaintiffs would likely experience
      mortgage payment distress and had a high likelihood of
      defaulting on the Note;

(g)   Concealing that there would not be sufficient equity
      in the Property to refinance the loan;

(h)   Concealing any risks or warnings associated with the
      securitization of the Plaintiffs' collateral
      (property);

(i)   Concealing that Defendants would wrongfully,
      improperly, and illegally report negative information
      as to the Plaintiffs to one of more credit reporting
      agencies, resulting in Plaintiffs having negative
      information on their credit reports and the lowering
      of their FICO scores such that they would not be able
      to qualify in the future to refinance the subject
      loan.

102. Under the circumstances, the material omissions and
the material misrepresentations of the defendants were
malicious.

103. Plaintiffs, not being investment bankers, securities
dealers, or mortgage lenders, reasonably relied upon the

representations of Defendants in agreeing to execute the mortgage loan documents.

104. Had Plaintiffs known of the falsity of Defendants' representations and/or have known of the omissions of material fact, Plaintiffs would not have entered into the transactions which are the subject of this action.

105. As a direct and proximate cause of the Defendants' material omissions and material misrepresentations, Plaintiffs are entitled to rescission of the subject Note and Mortgage, and damages in such amounts as shall be proven at the time of trial.

CLAIM V
UNFAIR AND DECEPTIVE ACTS OR PRACTICES

106. The allegations contained in the preceding paragraphs of this Complaint are incorporated herein by reference.

107. Each Plaintiff is a "consumer" as that term is defined in HRS § 480-1.

108. The described acts and practices involved "trade or commerce" as that term is used in HRS § 480-2(a).

109. An unfair or deceptive act or practice (hereinafter referred to as "UDAP") in the conduct of any trade or commerce is unlawful pursuant to HRS § 480-2(a).

110. Certain deceptive trade practices are also unlawful pursuant to HRS §481A-3.

111.   In connection with the subject loan, Defendants and/or their predecessors in interest engaged in UDAPs that violate HRS § 480-2(a) and/or 481A-3, including but not limited to:

    a.    Targeting financially unsophisticated and otherwise vulnerable consumers for inappropriate credit products;

    b.    Failing to adequately disclose the true costs and risks of the subject loan and its/their inappropriateness for Plaintiffs;

    c.    Failing to disclose that lender approved the subject loan based on financial documents required by Defendants such as Plaintiffs' tax returns and pay stubs without regard to Plaintiffs ability to sustain the loan with any reasonable means test;

    d.    Falsely representing and/or failing to fully and completely disclose the amounts Plaintiffs were required to pay;

    e.    Making a defective mortgage loan or loans that resulted in little net economic benefit to Plaintiffs with the primary objective of generating fees;

    f.    Attempting to deprive Plaintiffs of time in a fictitious modification process until the statute

of limitations passed beyond a time for their
legal right for rescission and/or cancel the
subject loan.

112. Defendants' and/or their predecessors' in interest
violations of TILA in connection with the subject loan
constitute UDAPs in violation of HRS §§ 480-2(a) and/or 481A-3.

113. The conduct caused Plaintiffs to suffer injury to
their property, including without limitation wrongfully induced
payment of money.

114. Defendants' and/or their predecessors' in interest
described acts and practices offend established public policy
and/or were immoral, unethical, oppressive, unscrupulous, and/or
substantially injurious to consumers, and were therefore unfair
in violation of HRS § 480-2(a).

115. Defendants' and/or their predecessors' in interest
described acts and practices involved material representations,
omissions or practices that were likely to mislead consumers
acting reasonably under the circumstances, and were therefore
deceptive in violation of HRS §§ 480-2(a), 481A-3 and/or 454M.

116. Pursuant to HRS § 480-12, a contract or agreement in
violation of HRS Chapter 480 is void and is not enforceable at
law or in equity.

117. Pursuant to HRS § 480-13(b)(1), a consumer who is
injured by a UDAP is entitled, for each UDAP, to be awarded a

sum not less than $1,000 or threefold any damages he or she sustained, whichever sum is the greater, and reasonable attorney's fees together with the costs of suit.

118. As a result of the wrongful acts and/or omissions of Defendants and/or their predecessors in interest, Plaintiffs are entitled to various remedies including, but not limited to, rescission, reimbursement, equitable recoupment, indemnification, damages (statutory, actual and treble damages), attorneys' fees and costs, and injunctive relief.

CLAIM VI
FAILURE TO ACT IN GOOD FAITH

119. The allegations contained in the preceding paragraphs of this Complaint are incorporated herein by reference.

120. Defendants and/or their predecessors in interest owed Plaintiffs a fiduciary duty to deal with them in good faith and in a fair manner.

121. Defendants and/or their predecessors in interest failed to deal with Plaintiffs in good faith and in a fair manner by making various misrepresentations of material fact and/or omissions of material fact, not making the mandatory federal law disclosures, not providing loan relief and/or modification of loan terms so Plaintiffs could maintain their interest in the Property, including but not limited to, failing to disclose that Plaintiffs were not financially qualified for

the loan, and/or the likelihood of the value of the Property falling, and that Plaintiffs were likely to default, and lose their home to foreclosure.

122. Plaintiffs suffering various injuries and damages in such amounts as shall be proven at the time of trial.

123. As a result of the wrongful acts and/or omissions of Defendants and/or their predecessors in interest Plaintiffs are entitled to various remedies including, but not limited to, rescission, reimbursement, equitable recoupment, indemnification, damages (statutory, actual, punitive, and treble damages), attorneys fees and costs, and injunctive relief.

CLAIM VII
VIOLATIONS OF THE REAL ESTATE SETTLEMENT PROCEDURES ACT

124. The allegations contained in the preceding paragraphs of this Complaint are incorporated herein by reference

125. As mortgage lenders, defendants are subject to the provisions of the REAL ESTATE SETTLEMENT PROCEDURES ACT ("RESPA"), 12 USC section 2601 et seq.

126. In violation of 12 USC section 2607 in connection with the mortgage loan to Plaintiffs, Defendants and/or their predecessors in interest violated RESPA by accepting charges for the rendering of real estate services that were in fact charges for other than services actually performed.

127. As part of the scheme alleged in this Complaint, MERS members give, and MERS accepts, kickbacks pursuant to an agreement that federally related mortgage loans shall be registered with MERS. Such kickbacks violate 12 U.S.C. § 2607(a) and are not a waivable violation.

128. When a MERS member originates a federally related mortgage loan and registers the note and/or mortgage with MERS, it passes on the MERS registration fee to the borrower.[7] It passes on the fee by including it within the fees disclosed on the HUD-1 Settlement Statement. The MERS member then kicks back to MERS the registration fee received by way of the borrower's payment of the settlement costs.

129. The registration fee that is actually paid by the Plaintiffs does not benefit them, but is instead wholly related to ongoing services that benefit the lender, servicer, MERS and/or its members.

130. As part of the scheme alleged in this Complaint, MERS members give, and MERS accepts, charges made or received for the rendering of real estate settlement services in connection with transactions involving federally related mortgage loans other than for services actually performed. Acceptance by MERS of such

---

[7] In 2006, the registration fee was $3.95. Beginning in 2007 this fee was increased to $4.95; subsequently increased again in 2009 to $6.95.

charges violates 12 U.S.C. § 2607(b), and is not a waivable violation.

131. Section 2607 of RESPA requires lenders to provide a special information booklet at the time of loan application.

132. Based on information and belief, the Special information booklet was not provided to the borrowers by Defendants at the time of the loan application.

133. As a result of the foregoing violations, defendants are liable to Plaintiffs for actual damages, treble damages, such other damages as the court may award, together with costs of the action and reasonable attorneys' fees.

CLAIM VIII
VIOLATIONS OF HOME OWNERSHIP EQUITY PROTECTION ACT

134. Plaintiffs reaffirm and reallege, as if fully set forth herein, each and every allegation in the preceding paragraphs of this Complaint.

135. In 1994, Congress enacted the Home Ownership Equity Protection Act ("HOEPA") which is codified at 15 U.S.C. §1639 et seq. with the intention of protecting homeowners from predatory lending practices targeted at vulnerable consumers. HOEPA requires lenders to make certain defined disclosures and prohibits certain terms from being included in home loans. In the event of noncompliance, HOEPA imposes civil liability for rescission and statutory and actual damages.

136. Plaintiffs are "consumers" and the Defendants are "creditors" as defined by HOEPA. In the Mortgage loan transaction at issue here, Plaintiffs were required to pay excessive fees, expenses, and costs.

137. Pursuant to HOEPA and specifically 15 U.S.C. section 1639(a)(I), Defendant and/or Defendant's predecessor(s) in interest is required to make certain disclosures to the Plaintiffs which are to be made conspicuously and in writing no later than three (3) days prior to the closing.

138. In the transaction at issue, Defendants and/or Defendant's predecessor(s) in interest were required to make the following disclosure to Plaintiffs by no later than three (3) days prior to said closing:

> "You are not required to complete this agreement merely because you received these disclosures or have signed a loan application. If you obtain this loan, the lender will have a mortgage on your home. You could lose your home and any money you put into it, if you do not meet your obligations under the loan."

139. Defendant and/or Defendant's predecessor(s) in interest violated HOEPA by numerous acts and material omissions, including but not limited to: (a) failing to make the foregoing disclosure in a conspicuous fashion; and (b) engaging in a pattern and practice of extending credit to Plaintiffs without regard to their ability to repay in violation of 15 U.S.C. Section 1639(h).

140. By virtue of the Defendant and/or Defendant's predecessor(s) in interest's multiple violations of HOEPA, including defective product issues, Plaintiffs have a legal right to rescind the consumer credit transaction.

141. Defendant and/or Defendant's predecessor(s) in interest further violated HOEPA by failing to make additional disclosures, including but not limited to Plaintiffs not receiving the required disclosure of the right to rescind the transaction.

142. Defendant and/or Defendant's predecessor(s) in interest further violated HOEPA by failing to provide an accurate Truth in Lending (TIL) disclosure.

143. As a direct consequence of and in connection with Plaintiffs loss of legal and lawful exercise of their right to rescission, wherein the true "lender" is required, within 20 days of this notice of rescission to: (a) Desist from making any claims for finance charges in the transaction; (b) Return all monies paid by Plaintiffs' connection with the transaction to the Plaintiffs; and (c) Satisfy all security interests, including mortgages, which were acquired in the transaction.

144. Upon the true "lenders" full performance of its obligations under HOEPA, Plaintiffs shall tender all sums which the true "lender" is entitled.

145. Based on defendants HOEPA violations including but not limited to defective product issues, each of the defendants is liable to the Plaintiffs for the following, which Plaintiffs demand as relief:

(a)  Rescission of the mortgage loan transactions;

(b)  Termination of the mortgage and security interest in the property the subject of the mortgage loan documents created in the transaction;

(c)  Return of any money or property paid by the Plaintiffs including all payments and improvement costs made in connection with the transactions;

(d)  An amount of money equal to twice the finance charge in connection with the transactions; including

(e)  Relinquishment of the right to retain any proceeds;

(f)  Actual damages in an amount to be determined at trial; and

(g)  Attorney's fees.

CLAIM IX
VIOLATIONS OF FEDERAL TRUTH-IN-LENDING ACT

146. The allegations contained in the preceding paragraphs of this Complaint are incorporated herein by reference.

147. The Truth in Lending Act (TILA), 15 U.S.C. §1605 et seq. and Regulation Z, Section 226.4 requires Defendants and/or its predecessors in interest to fully and completely disclose the loan terms, the finance charge, the annual percentage rate, the right to rescind, and other consumer rights. These charges

and rights were not fully and timely disclosed constituting a violation of TILA.

148. TILA also requires initial disclosures to be issued within three business days of receipt of the loan application and of any changes to the terms of a loan program. Borrowers are typically entitled to a TILA disclosure concurrently with the RESPA Good Faith Estimate. The purpose of the early TILA disclosure and the RESPA Good Faith Estimate is to give the borrowers an opportunity to review the proposed terms and compare loan terms being offered by other lenders. The documents provided to the borrowers by the lender did not include an initial truth in lending statement or a good-faith estimate constituting a violation of TILA.

149. Defendants' and/or their predecessors' in interest failure to provide the required disclosures provides Plaintiffs with the right to rescind the transaction, and Plaintiffs, through this public complaint which is intended to be construed, for purposes of this claim, as a formal notice of rescission as may be applicable in common law and equity, hereby elect to rescind the transaction.

150. Pursuant to TILA, Defendants and/or their predecessors in interest are liable to Plaintiffs in amounts equal to the sum of actual damages and such additional damages as the court may

allow, and the costs of action together with reasonable attorney's fees.

CLAIM X
BREACH OF FIDUCIARY DUTY

151. The allegations contained in the preceding paragraphs of this Complaint are incorporated herein by reference.

152. Defendants and/or their predecessors in interest, by their actions in contracting to provide mortgage loan services and a loan program to Plaintiffs which was not only to be best suited to the Plaintiffs given their income and expenses but by which Plaintiffs would also be able to satisfy their obligations without risk of losing their home, were "fiduciaries" in which Plaintiffs reposed trust and confidence, especially given that Plaintiffs were not and are not investment bankers, securities dealers, mortgage lenders, mortgage brokers, or mortgage lenders.

153. Defendants and/or their predecessors in interest breached their fiduciary duties to the Plaintiffs by fraudulently inducing Plaintiffs to enter into a mortgage transaction which was contrary to the Plaintiffs stated intentions; contrary to the Plaintiffs interests; and contrary to the Plaintiffs preservation of their home.

154. Defendants and/or their predecessors in interest, or entities with in the enterprise of Defendants, breached their

fiduciary duties to the Plaintiffs by taking positions in the highly leveraged futures or options market, such interests were in direct opposite of Plaintiffs' interests and the general housing market as a whole.

155. As a direct and proximate result of the Defendants and/or their predecessors in interest breaches of their fiduciary duties, Plaintiffs are entitled to rescission and damages.

156. Under the totality of the circumstances, the Defendants', and/or their predecessors' in interest, actions were willful, wanton, intentional, and with the callous and reckless disregard for the rights of the Plaintiffs, justifying an award of not only actual compensatory but also exemplary punitive damages to serve, as it turned out not only in the future conduct of the named Defendants and/or their predecessors in interest herein, but also to other persons or entities with similar inclinations.

CLAIM XI
UNJUST ENRICHMENT

157. The allegations contained in the preceding paragraphs of this Complaint are incorporated herein by reference.

158. Defendants have an implied contract and warranty with Plaintiffs to ensure that the Plaintiffs understood all fees, rates, payments and charges which would be paid to the

Defendants, to obtain credit on Plaintiffs' behalf, to not charge any fees which are not related to the settlement of the loan and without full disclosure to Plaintiffs and that the loan products together would provide a 30-year mortgage designed specifically with the Plaintiffs' known personal financial information required by the Defendants.

159. Defendants cannot, in good conscience and equity, retain the benefits from their actions of charging a higher interest rate, fees, rebates, kickbacks, profits and gains from any resale of mortgages and notes using Plaintiffs' identities, credit scores, income, appraisal and reputation without consent, right, justification or excuse as part of an illegal enterprise scheme.

160. Defendants have been unjustly enriched at the expense of the Plaintiffs, and maintenance of the enrichment would be contrary to the rules and principles of equity.

161. Defendants have also been additionally enriched through the receipt of payment from third parties including, but not limited to, investors, insurers, other borrowers, the United States Department of the Treasury, United States Federal Reserve, and others.

162. Plaintiffs thus demand restitution from the Defendants and/or their predecessors in interest in the form of actual damages, exemplary damages, and attorney's fees.

CLAIM XII
COMPLAINT TO QUIET TITLE

163. The allegations contained in the preceding paragraphs of this Complaint are incorporated herein by reference.

164. By means of this public complaint, Plaintiffs have given notice to Defendants of their rescission of the subject loan transaction but have only sent those notices to the entities that have been disclosed. Hence, without this action, neither the rescission nor the reconveyance that the Plaintiffs are entitled to file gives Plaintiffs full and clear title to the property.

165. The real party in interest on the Lender's side may be the owner of the asset-backed security, the insurer through some claim of equitable interest, or some other person or entity. The security is a "securitized" bond deriving its value from the underlying mortgages of which the subject Mortgage is one. Thus, Plaintiffs are entitled to quiet title against Defendants and/or their successors and assigns, which will be identified herein when their identities become known.

166. Plaintiffs are informed and believe and thereupon allege that at all times herein mentioned each of the Defendants sued herein was the agent and employee of each of the remaining defendants and was at all times acting within the purpose and scope of such agency and employment.

167. Plaintiffs are informed and believe and thereupon allege that each of the Defendant claim or may claim an interest in the property adverse to Plaintiffs herein. However, the claim of said defendants are without any right whatsoever, and said defendants have no legal or equitable rights, claim, or interest in said property.

168. Plaintiffs therefore seek a declaration that the title to the subject property is vested Plaintiffs alone and that the Defendants herein, and each of them, be declared to have no estate, standing, right, title or interest in the subject property and that the Defendants and each of them, be forever enjoined from asserting any estate, standing, right, title or interest in the subject property adverse to Plaintiffs herein.

169. Wherefore, in this claim, Plaintiffs pray this Court will enter judgment against Defendant and each of them, as follows:

(a) For an order compelling said Defendant(s), and each of them, to extinguish all alleged encumbrances thereon and possession of the subject property to Plaintiffs herein and to fully cooperate with Plaintiffs in the clearing of clouded title issues;

(b) For a declaration and determination that Plaintiffs are the rightful holders of title to the property and the Defendant(s) herein, and each of them, be declared

to have no estate, standing, right, title or interest

in said property;

(c)   For a judgment forever enjoining said defendants, and

each of them, from claiming any estate, standing,

right, title or interest in the subject property;

(d)   For costs of suit herein;

(e)   For such other and further relief as the court may

deem proper.

CLAIM XIII
VIOLATION OF HAWAII BUREAU OF CONVEYANCE REGULATIONS

170. The allegations contained in the preceding paragraphs

of this Complaint are incorporated herein by reference.

171. Pursuant to Hawaii Revised Statutes HRS § 454M[8], as

revised or amended effective July 2010, Defendants, as mortgage

---

[8] **[§454M-6]  Prohibited activities.**  It shall be unlawful for any
mortgage servicer in the course of any mortgage loan
transaction:

(1)   To misrepresent or conceal material facts, to make
false promises, or to pursue a course of misrepresentation
through its agents or otherwise;

(2)   To engage in any transaction, practice, or course of
business that is not in good faith, does not constitute fair
dealing, or that constitutes a fraud upon any person, in
connection with the servicing, purchase, or sale of any mortgage
loan;

(3)   To fail to comply with the mortgage loan servicing
transfer, escrow account administration, or borrower inquiry
response requirements imposed by Sections 6 and 10 of the Real
Estate Settlement Procedures Act, 12 United States Code Sections
2605 and 2609, and regulations adopted thereunder by the
Secretary of Housing and Urban Development; or

servicers, are required to register and be licensed with the State of Hawaii. Plaintiffs believe that Defendants are not properly registered or licensed to act. No such licensing as required by law can be found.

172. As detailed within this Complaint, Defendants have engaged in activities that violate HRS § 454M and are subject to the penalties[9] for these and other violation to be proven at trial.

173. The State of Hawaii administrative rules "Department of Commerce and Consumer Affairs", Chapter 178, "administrative special mortgage recording fee guidelines" requires every transfer of an interest in real property, except fixtures, made as security for the performance of another act or subject to defeasance upon the payment of an obligation, to be properly recorded. The special mortgage recording fee (SMRF) is a special mortgage recording fee imposed on each mortgage and each

---

(4)   To fail to comply with applicable federal laws and regulations related to mortgage servicing. [L 2009, c 106, pt of §1]

**[§454M-9]  Private right of action.**  Nothing in this chapter shall be construed to preclude any individual or entity that suffers loss as a result of a violation of this chapter from maintaining a civil action to recover damages and, as provided by statute, attorney's fees. [L 2009, c 106, pt of §1]

[9] **[§454M-10]  Penalty.**  Any person who violates any provision of this chapter may be subject to an administrative fine of not more than $5,000 for each violation.

amendment to a mortgage which increases the principal amount of the secured debt. The SMRF must be filed at the State of Hawaii Bureau of Conveyances and/or filed with the assistant registrar of the Land Court of the State of Hawaii.

174. Based on information and belief, the Mortgage and Note at issue has been traded (sold). The borrowers' Second Mortgage is an adjustable rate mortgage that constantly increased the principal amount of the secured debt, and Defendants and/or their predecessors in interest should have filed a SMRF and an assignment of mortgage for each assignment of said Mortgage.

175. Defendants have sought to foreclose Plaintiffs' real property and receive a distribution from the sale of Plaintiffs' property without possessing legally enforceable, recorded assignment of mortgages from the actual mortgagees. Under Hawaii law, before an entity would be entitled to receive a distribution from the sale of real property, their interest therein must have been recorded.

176. Defendants' acts of pursuing a non-judicial foreclosure action without the requisite legal title, while falsely stating that it had such title, and while lacking the right to engage in trust business in Hawaii, constitutes a "false, deceptive or misleading representation or means" in connection with the collection of a debt, in violation of the

Federal Fair Debt Collection Procedures Act, 15 U.S.C. Sec. 1692e.

177. All of the Defendants are "debt collectors" as defined in 15 U.S.C. 1692e, because they regularly use instrumentalities of interstate commerce, and the mails, in attempting to collect, directly, or indirectly, debts owed or due or asserted to be owed or due to another, namely the actual lenders, mortgagors, and certificate-holders under the above-referenced pooling and servicing agreements.

178. Upon information and belief, Defendants failed to establish a complete chain of assignment from the originator to the person assigning the Mortgage to Defendant.

179. Failure to file these assignments in the State of Hawaii Bureau of Conveyances and/or with the Assistant Registrar of the Land Court prohibits Defendants from exercising any judicial procedures against the Plaintiffs.

180. As a direct and proximate result of the actions of Defendants, Plaintiffs are entitled to possession of their home, entitled not to be evicted, and are entitled to damages in such amounts as shall be proven at the time of trial.

CLAIM XIV
MISTAKE

181. The allegations contained in the preceding paragraphs of this Complaint are incorporated herein by reference.

182. If the above mentioned wrongful acts and/or omissions of Defendants were not fraudulent misrepresentations and/or omissions of material fact, then the underlying transaction was entered into based upon mutual mistake which entitles Plaintiffs to actual damages including all fees and costs paid to obtain the loan, together with other claims in such amounts as shall be proven at the time of trial.

CLAIM XV
UNCONSCIONABILITY

183. The allegations contained in the preceding paragraphs of this Complaint are incorporated herein by reference.

184. Plaintiffs placed their trust and confidence in Defendants and/or their predecessors in interest to make proper and timely disclosures, and properly qualify them for the loan, provide loan terms that were in accord with economic conditions existing at the time, among other things.

185. Plaintiffs did not understand the loan transaction. They were not informed and did not understand the effects of their loan(s) being securitized. They did not understand and were not informed by Defendants of the true terms of the Notes and Mortgages, and were not fully and timely informed of the same by Defendants and/or their predecessors in interest, who held superior bargaining power over Plaintiffs.

186. As a result of the above, the terms and conditions of the Notes and Mortgages are unconscionable, and Plaintiffs are entitled to damages, repayment, reimbursement and/or indemnification of all monies that were paid and other claims in such amounts as shall be proven at the time of trial.

CLAIM XVI
RECOUPMENT

187. The allegations contained in the preceding paragraphs of this Complaint are incorporated herein by reference.

188. As a result of the various wrongful acts and/or omissions made by Defendants and/or their predecessors in interest, Plaintiffs are entitled to equitable recoupment of all monies paid by them with regard to the subject loan transaction, including all broker's fees and commissions, closing costs, all other fees, costs and expenses, interest and principal payments, and the loss of the value of their investment in the Property, including Plaintiffs' improvements to the Property.

CLAIM XVII
NEGLIGENT AND/OR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

189. The allegations contained in the preceding paragraphs of this Complaint are incorporated herein by reference.

190. Defendants and/or their predecessors in interest owed Plaintiffs a duty to avoid negligently and/or intentionally inflicting severe mental and emotional distress upon Plaintiffs.

191. Defendants and/or their predecessors in interest breached their duties by causing Plaintiffs to suffer severe mental and emotional distress, by misleading them, providing a loan product they were not properly qualified for, in causing them to lose their savings, by giving them false hope they would qualify for a refinance and/or loan modification, that they would be allowed loan assistance or modification on reasonable terms that would allow Plaintiffs the right to keep their home, when, in fact, the contract between the loan servicer and the investors precluded any modification of the mortgage contract by the servicer, among other wrongful and misleading acts.

192. The wrongful acts and/or omissions of Defendants and/or their predecessors in interest were a substantial factor and/or proximate cause of Plaintiffs' suffering injuries and damages in such amounts as shall be proven at the time of trial.

193. As a result of the wrongful acts and/or omissions of Defendants and/or their predecessors in interest, Plaintiffs are entitled to various remedies including, but not limited to, rescission, reimbursement, equitable recoupment, indemnification, damages (statutory, actual, punitive and/or treble damages), attorneys' fees and costs, and injunctive relief.

CLAIM XVIII
VIOLATION OF HAWAII REVISED STATUTES CHAPTER 667

194. The allegations contained in the preceding paragraphs of this Complaint are incorporated herein by reference.

195. Hawaii Revised Statutes Chapter 667, and more specifically section 667-5 et seq. provides, in part, that when any mortgagee or its successor in interest intends to foreclose under power of sale, they shall be represented by an attorney who is licensed to practice law in the state who is physically located in the state, who shall give notice of the intent to foreclose by publication of notice once in each of three successive weeks, the last to be not less than 14 days before the date of sale, in a newspaper having a general circulation in the county in which the mortgaged property lies, and to post said notice on the premises not less than 21 days before the date of sale; and to record an affidavit of sale by the person conducting the foreclosure, showing compliance with the requirements of the power of sale and the statute.

196. In this case, the mortgagee or its successor in interest did not have the clear right to foreclose on said property, was not represented by an attorney licensed to practice law in the state who was physically located in the state who provided the notice of intent to foreclose under power of sale, the notice was illegal and required conditions beyond

those allowed in the statute, and the notice of intent to

foreclose was not published once in each of three successive

weeks the last to be not less than 14 days before the date of

sale in a newspaper having a general circulation in the county

in which the mortgaged property lies, and Plaintiffs were not

notified at least 21 days before the date of sale.

197. Thus, the foreclosure under power of sale is invalid

and Plaintiffs are entitled to one or more of the following

remedies: Return of the property; actual damages in an amount to

be determined at trial, and attorney's fees and costs.

CLAIM XIX
VIOLATIONS OF THE FAIR DEBT COLLECTION PRACTICES ACT

198. The allegations contained in the preceding paragraphs

of this Complaint are incorporated herein by reference.

199. The Fair Debt Collections Practices Act (FDCPA), 15

U.S.C. §§ 1692-1692p as amended by Pub. L. 109-351, Sections

801-02, 120 Stat. 1966 (2006), Section 809 requires among other

things, that within five days after the initial communication

with the consumer in connection with the collection of any debt,

the debt collector shall send the consumer written notice

containing the amount of the debt, the name of the creditor, and

that the consumer may dispute the debt within 30 days, and if

the consumer notifies the debt collector that the debt or any

portion thereof is disputed, it shall cease collection of the

debt until it verifies the debt or the name and address of the original creditor and this information is mailed to the consumer.

200. In this matter, Defendants and/or their predecessors in interest failed to give Plaintiffs the required notice and opportunity to contest the debt and request reliable verification of the same, considering the amount of lender and servicer fraud that has been publicized as occurring across the United States, including Hawaii.

201. Defendants and/or their predecessors in interest's failure to give the required notice voids and invalidates any foreclosure action conducted with regard to the subject property.

202. Pursuant to section 813, Defendants and/or their predecessors in interest are liable to Plaintiffs in amount equal to the sum of actual damages and such additional damages as the court may allow, and the costs of action together with reasonable attorney's fees.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs demand Judgment against Defendants, as follows:

WHEREFORE, Plaintiffs demand Judgment against Defendants, as follows:

1.   For a judgment of Rescission.

2.   For a judgment awarding statutory damages in such amounts as shall be shown at the time of trial.

3.   For a judgment awarding actual damages in such amounts as shall be proven at the time of trial.

4.   For a judgment awarding treble damages.

5.   For a judgment awarding punitive damages in such amounts as shall be proven at the time of trial.

6.   For a Temporary Restraining Order or Order for Injunctive Relief.

7.   For a judgment of recoupment, reimbursement and/or indemnification in such amounts as shall be proven at the time of trial.

8.   For such other and further relief as the Court deems just and equitable in the premises.

## DEMAND FOR JURY TRIAL

Plaintiffs, and each of them, hereby demand trial by jury on all issues triable by right to a jury.

Dated this 15TH day of November, 2010, at Wailuku, Hawaii.

IVEY FOSBINDER FOSBINDER LLLC
A LIMITED LIABILITY LAW COMPANY


JAMES H. FOSBINDER
*Attorney for Plaintiffs*